Good morning. May it please the Court, my name is Bob Biggs and I represent American Trucking Associations. We would like to cede five minutes of our time to the Department of Justice, who will be representing the amicus Department of Transportation in this case, and I'd also like to reserve two minutes for rebuttal. This appeal involves basically two issues. Whether the District Court interpreted the scope of the motor vehicle safety exception to preemption correctly and whether the District Court erred in its analysis of whether motor carriers will suffer irreparable harm under the concession plans. To avoid repetition, I'm going to defer to the Department of Justice Attorney to discuss the issues involving the motor vehicle safety exception. I'd like to concentrate my remarks on the issue of whether motor carriers will face irreparable or do face or are facing irreparable harm from the concession plans. In the Morales case, the United States Supreme Court in a very similar situation involving the Airline Deregulation Act said that the airlines really faced a Hobson's choice, and that's what motor carriers face here. They can either decide not to become concessionaires and suffer the consequences and penalties associated with that decision, or they can bear the burden of the concessions and suffer, again, the consequences associated with getting a concession agreement. In terms of those who choose not to apply for a concession Yes, sir. I don't want to stop the whole flow of your argument, but I want to ask one question before we run out of time and we lose it. When I read the briefs and when I read the position that's been taken by American Trucking, it looks to me as if, well, they're saying this is kind of an all or nothing deal. The concession agreement's good or it's not good. Am I correct? The American Trucking Association? Yes, Your Honor. There are certainly That's your position. It's good or not good. I mean, it's yes, no, correct? Yes, no, yes. That's all I wanted to ask. You may go on. Just to elaborate You couldn't live with some of the provisions? Some of the provisions, certainly on a stand-alone basis, would be all right. Some of the provisions would deal with, for instance, a registration requirement. A lot of the provisions that are associated with the clean trucks program, not the concession program, are independent of the concession plans. All of the environmental issues, the truck retirement, the drage truck registry, the incentive programs, the container fee, all of those things are separate from the concession plans. So they're not even at issue in this litigation. My question to you, though, was more you're saying enjoy the concession agreements or don't. I mean, that's what you're saying. That's correct. And certainly the ports would be free to come back with a different type of plan or program in which it did not involve withholding the right to operate in interstate commerce as a penalty or controlling access to the ports as a replacement for the concession plans. In any event, as I was mentioning, the persons who refused to become concessionaires, and we know from the economic study that the Port Zone did that there were about 1,300 motor carriers servicing the ports. And the economic study predicted, and I think has been borne out in results, that there would be a huge reduction in motor carriers. In fact, that is the goal of the ports in these programs. They've said quite bluntly that they want to have fewer motor carriers servicing the ports, larger entities, larger motor carrier entities who they believe will be more fiscally sound and stable. That's their goal. And the goal is not because of safety or security. The goal is because they, it's for employment reasons, and they think they will be more financially able to meet the ports' environmental goals. So we believe that there will be a lot of a shakeout of motor carriers in terms of the concession plans. And, of course, they will lose all of their business in the ports and lose all income from the ports. Others who may decide that they simply want to sit back and wait for the end of this litigation and not service the ports in the interim period, they would lose the customer goodwill. And certainly the cases that this court has reviewed in the past have said that being driven out of business or loss of customer goodwill all amounts to irreparable harm. And the ports respond by saying, well, they could just do other kinds of trucking business. But that's not really a reality in today's economy especially. Trucking is very competitive and it's very segmented and very specialized. So it would be very difficult for these small carriers of having to move from port operations to find business and work in other kinds of port action. Is all cargo removed from the port facilities in both cases by trucks or is some sent by rail? There is some that is removed by rail. That's right, Your Honor. Does this somebody have a device? The district court really only looked at the irreparable harm issue from the perspective of those who chose to have concessions. The judge below didn't look at the harm that would fall to the motor carriers that either could not become concessionaires or chose not to have their constitutional rights violated. So I think that was fundamental error and I think there's clear irreparable harm with respect to those entities. With respect to those who, as the court said in the Morales case, couldn't take the principled approach, couldn't afford it, excuse me, in the Nelson case, they have gone forward with the concessions, become concessionaires, and they, of course, are bearing a number of kinds of burdens. First of all, the burden of having their constitutional rights violated. I believe there should be a presumption that when you are subjected to an unconstitutional regulation, that is in and of itself irreparable harm. In addition to that, there's certain administrative costs that are discussed in the briefs, but more particularly there are large costs associated, especially with the Port of Los Angeles plan, in moving from what is now the dominant business model, and that is the use of independent contractors, moving towards a system which in five years has to be all employees in company-owned vehicles or company-leased vehicles. Now, the court below said, well, that's off in the future, but that future is getting here very quickly. And at this point, by the end of 2009, during the last quarter of that period of 2009, 20% of the trips that every trucking company that's a concessionaire makes into the ports will have to be by employee drivers in either leased or company-owned trucks. So it's a very big burden and a very big job for the motor carriers to do all the things necessary to hire drivers and to procure the trucks for those individuals. Is that the key aspect of the concession plan that you allege causes you the irreparable harm? It is certainly one of the major aspects that we're concerned about as the owner-operator. There's also things like financial oversight. This indeed is a form of economic regulation. I believe that Congress said you couldn't have economic regulation in the guise of safety regulation. Here it's only not in the guise of safety regulation. A lot of these things have nothing to do with safety. In fact, the only ones that have anything to do with safety regulation are elements that are simply redundant of federal and state requirements. There's no really independent safety requirements that the ports have put in place. The trial judge, and I see I'm running out of time, so I will defer the rest of my argument time, five minutes, to the Department of Transportation Counsel, and I will save two minutes for rebuttal. Okay, that's fine. May it please the Court, Melissa Patterson for the United States. Your Honors, the United States has participated as amicus in this action because several aspects of the ports' concession agreements do not fall within the motor vehicle safety exception to Section 14501C. And we think several of these problematic elements regulate not the safety of motor carriers' actions, but the way that they do business. And that's precisely the type of localized economic re-regulation of the motor carrier industry that Section 14501C was designed to prevent. Essentially what the ports have done is impose a licensing regime saying you must comply with these various requirements before you can provide services to the many marine terminal operators and the substantial amount of international commerce that happens within the ports. And they specifically say they're doing that for environmental and safety reasons. They do invoke safety reasons, Your Honor, but as the Tillerson Court noted, you can't simply defer to a legislative statement. And I think the Second Circuit has really fleshed out the sort of second step of the analysis. Once you have a statement of legislative intent, you need to see whether or not the purported safety assessment, I think was the Second Circuit's words, actually jive with reality. And here the purported safety rationale for things like the independent contractor ban are only purported to be safety-related at the highest level of generality. The ports say it's going to be easier for us to administer safety regulations if there are fewer, larger, more stable licensed motor carriers operating. Now, at that level of generality, the State of California could say, you know, it's really easier for us to enforce our safety regime if we only had one motor carrier. So we're only going to allow UPS in, and that way we know whenever there's a safety violation, we know who to go, who to hold accountable for it. So we think the district court erred in accepting this very high level of generality. There's really no apparent link in the record between safety, or lack thereof, and independent contractor drivers. A licensed motor carrier that hires independent contractors is responsible for the safety and the actions of that independent contractor operating under its DOT operating authority in precisely the same way that that company is responsible for its employee drivers. And I think that it's clear that this is a sort of economic regulation. Does it make a difference that, as counsel just said, it's an all-or-nothing situation? They didn't ask for a narrow, tailored injunction, for example, just in joining the business model provision. The United States has not taken a position on the severability analysis. Even if this court decided to affirm the denial of the preliminary injunction, however, for whatever reason, we think it would be appropriate and wise for this court to give the district court guidance on the scope of the motor vehicle safety exception, because this is not an academic exercise. There is going to be a permanent injunction hearing at some point. And we think, again, the district court really overread that motor vehicle safety exception. And I'd like to point to another sort of error. Even if ATA was not asking for a sort of element-by-element analysis of the agreements, we think the district court erred in not really looking at each element and sort of aggregating them to decide, well, some of the elements here are safety-related, so the whole thing must be safety-related. Is the off-port parking ban, is that safety-related or not? Your Honor, as we read it, the ports are banning trucks that access the ports from parking in other jurisdictions, even where it may be legal to park in that jurisdiction. Now, what this has the effect of doing is discriminating against smaller motor carriers who are less likely to have off-street commercial lots. So if the city of Long Beach and Los Angeles thought that it was dangerous to have trucks parked on the street, they can certainly ban those. That would be safety-regulated. But they haven't really articulated why it's safe for some trucks to park there, but not trucks operating within the ports and serving the international commerce there. So I think there hasn't really been. Let me ask you one other question before you sit down. From DOT's perspective on the safety exemption, what's the limiting principle? How do you understand it to apply under today's sort of case law? Your Honor, we haven't put forth a sort of definitive bright-line test. As, indeed, the Morales Court said, some of these preemption issues aren't really amenable to a bright-line test. However, I think at the outermost limits, what it can't do is allow a state to slap a label of safety on something that's really economic and let anything become safety-related. That really would allow the exception to swallow the rule. I notice I'm going to get into counsel's rebuttal time. If I could just say one more thing. Sure. To the extent that port security is involved here, any measure that's authorized or required under federal law under the Maritime Transportation Safety Act wouldn't even come within the scope of preemption. So the idea that there are no port security measures that can be put in place if you don't read the motor vehicle safety exceptions expansively is simply without basis. Thank you. Okay. Thank you. Good morning, Your Honors. I'm Steve Rosenthal, and I represent the Port of Los Angeles. I'm going to be taking ten minutes. My colleague, Mr. Benner from Long Beach, will be taking five. The clean truck program today took two years to develop and implement after extensive public and stakeholder input. And they're not identical. They are not identical. As of today, March 4th, 14,500 trucks are admitted to Los Angeles. 14,200 trucks are admitted at Long Beach for entry under the program. The three affiants who submitted declarations asked, applied for concessions, were granted concessions in September. So the whole notion of injury to people who don't join, that's off the table. Everyone essentially is in the program. Well, that's not the point, though, is it? The point is you're put to a choice. You can join or not join. So if you can be heard on either side of it, that's the point. It's not the point that somebody did join or didn't join. Let me ask you my question I ask the other folks. Reading your briefs and your approach to this case, it looks to me, as if you said, either you don't enjoin the concession agreement or you do, but we don't want to sever and take piece by piece. Am I correct? Your Honor, that was what was requested in the injunction. I'm asking what your position is. Our position is that if the concession program were enjoined, we would lose the mechanism, the legal mechanism to enforce the pieces. I didn't ask you that question. I said are you taking the position that either the whole is enjoined or nothing is enjoined? That's my question. In other words, if we found part, horror of horrors, if we thought in some ways you overreached and that should be enjoined, are you suggesting it's severed or are you suggesting it not be severed? We certainly would believe that if push came to shove, we would try to keep a portion of the program. We would not take the baby out with the bathwater. Can I point out, there was not word one from the other side about two of the winter factors, which was the irreparable injury and the public interest. The fact is the record is indisputable. They did talk about irreparable injury. No, they talked about irreparable injury to the plaintiff. They did not. They didn't talk about balancing the harm. That is exactly right. But they talked about irreparable injury. That is exactly right. So we're talking about balancing harm. We're talking about the balancing harms. And on the defendant's side, we believe that these programs are critical to the safety of the port, that we need the concessions to protect the safety of the port. We need it to enforce the Clean Air Act mechanisms that are included. So are you using safety to carry out your environmental objectives? No. No. It's all one program. But for present purposes, the security aspects are what we're relying on in front of this court. So how does the plan or the elements of the concession program further security? The, in several ways. The program, the concession agreement makes the individual motor carriers responsible for the data that is submitted. What we get under the Or safety. Your Honor, basically up until October 1st, we had no ability to control who was coming onto the port. We had no mechanism that identified the cargo, identified the drivers, identified the responsible carrier. And if you didn't have the concession agreement, are you telling me that there's no other way you could achieve that objective? There might be alternative ways to achieve that objective. But this is the program we have, in fact, developed after Hitler. So the safety justification that you're presenting for today is that it allows you to track who's coming in and out of the port. And more importantly, makes the individual truckers responsible for that data and who is carrying this cargo into and out of the port. And in your view, this gives you the authority to put small independent truckers out of business on the theory that, well, you should be employed by somebody, you'll get better wages, and we can control you better if you're employed by somebody. For employees of some giant organization, that's good. But being a little independent guy who owns your own truck, like we know most truckers are and do, that's bad. We don't want you on our property. Is that correct? And you believe that your interest in port safety allows you to control the whole structure of that industry. Is that correct? Well, not the whole structure, certain elements. It's not like the whole structure. It's not like the whole economic financial structure of that industry, is it not? Well, Your Honor, the fact is that that element of the program was not squarely in front of the district court, because it was 15 months off at the time of the injunction here. It's part of the concession plan, wasn't it? It is eventually part of the concession plan. As my understanding, it's in play today, correct? Twenty percent have to be 20 percent. Only that's only in play as of the end of the year. That doesn't even make sense, does it, Counselor? You're suggesting that a large trucker or any trucker could say, okay, we have to have 20 percent in by December 31st, and therefore we'll wait until December 15th and we'll start hiring people, putting in the processes to have a hiring system. We'll start then trying to get independent truckers to work for us and go out of business? Is that what you're suggesting? Your Honor, Your Honor, even if this Court were to find that element that was beyond the safety program, that would not say that the concession concept was not itself an appropriate way for the State to enforce the safety mechanism independent of that particular requirement. That's why I asked you. You folks didn't seem to breathe it or argue it that way. That's why I asked you. Are you talking about these things should be severed? And I think you said yes. Yes, we did. You're saying again, yeah, you should sever it if it's terrible. But your argument you were making a moment ago was that it's wonderful and it's safety related. I am defending the element, but if the Court holds that the element is outside the safety requirement. I'm asking you, how do you defend that element by saying we have the right to restructure all business plans of all these people and the way they run their lives in the trucking industry? We have the right to do that. How do you justify that? I justify that, Your Honor, because what was found after extensive review is that the existence of the independent contracting element makes the companies essentially dispatchers. They don't really have direct control over these shipments in the way that an employee-employer relationship. So how does that relate to the safety regulatory authority of the State with respect to motor vehicles? The way this whole program relates, Your Honor, is the fact that we do not believe, Your Honor, that safety and security as the government contends and as ATA contends simply means that we can stop a truck because the brakes are defective. We believe that safety permits us to stop a truck that's carrying two tons of dynamite with a fuse coming out of the back, that that is as much safety as the brakes. How does this new business model accomplish that objective? Well, if Your Honor is talking about the employee mechanism, as I think we indicated to you, putting that to one side, we believe the other elements do relate to this. The requirement that a concession be entered into, that truck data be entered into the DTR, the requirement that we be able to inspect the trucks, these are all things that are being objected to by ATA. How about they now park on the street? Well, the parking on the street. I'm sorry, Your Honor. How about the safety to the port if they do or don't park on the street? Well, that relates generally to the safety of the trucks, maybe not to the port, but to the surrounding community. Other trucks can park on the street, but not trucks that use the port. And that's how you're going to preserve the safety of the port, correct? Correct, Your Honor. Is age of a truck, per se, a safety question? I'm sorry? I have a good sound truck that is 12 years old. It's only got 200 miles on it. And it can't go on your property. Well, the age does make a difference because the engines meet environmental standards based on when the engines were manufactured. There was an 89 standard. In 2007, EPA adopted a much more stringent standard that decreases diesel emissions from the truck engine. It's not the truck, per se. It's the engine that is the critical element here. And in 2007, the emission standards declined. Does the engine on the train meet the same smoke requirements, exhaust requirements? It's an entirely different regulatory scheme, Your Honor. If you want to cede time to your co-colleague. Yes, thank you. May it please the Court, I'm Jonathan Zenner, representing the Long Beach Appalachians, accompanied by Paul Gale. Your Honor, in listening to the colloquy so far, I think it's important to recognize what the issue is as we see it coming before this Court now. The issue is whether the district court abused its discretion in not granting the preliminary injunction. This is a very complex program. Obviously, the Court has raised a number of questions about elements of that program. Suffice it to say that we believe that the district court acted appropriately, given the Court's balancing of harms, given its almost anticipation of the winter criteria. Well, if we found several defects constitutionally, should we shut down the whole program so it's a unit effect? I would echo. Or should we just take care of the two problems? I would echo what Mr. Rosenthal said. We think all of these measures can be defended. However, the problem with the way the case came before the district court and the way it comes before you is that the plaintiffs had asked for a complete injunction against the entire concession program. And when you think about what the courts, both of them, were looking at here, it's a complex juxtaposition of environmental safety and security concerns that they tried to deal with in one program. And the difficulty, the practical difficulty, facing the district court and facing this court is how do you remove one moving part without causing the whole thing to collapse? That requirement. Long Beach didn't find it necessary to have this interesting business model, nor did it find it necessary to prevent trucks from parking off premises, did it? Your Honor, there are differences. There are differences in the program, and probably the primary difference that has attracted discussion is the employee requirement that you're referring to. But it did find it necessary to have a kind of union hall, what it's called, model of hiring employees, right? It thought that was really necessary. Does it have that? Well, I think what Long Beach was attempting to do, I understand what you're referring to, but I'm not sure I could accept the characterization of what they were trying to do, was to make sure that there was continuity, that the drivers who at one time had been appearing as independent owner-operators would certainly have the ability to act as employees. But all of them... Not ability, it was priority. Wasn't it something about priority? Yes. I think that's correct. But my point here is that what the courts are being asked to do and what the district court used its discretion with this extraordinary writ that it was being asked to issue, it was correct in refusing to do that. A lot of the issues that we're talking about today are factual issues that will get ironed out. Well, you know, you're right. It is abusive discretion. But we look, if the district court misapplied or misunderstood the law in applying, in determining whether an injunction was warranted, that could be abusive discretion. So all of this really focuses, did the district court misread or misunderstand the breadth and scope of the safety exception? Your Honor, that is the discussion that we're having today. I submit respectfully that there's a lot more to the case than just that point. And I even, as I hear the Department of Justice counsel speaking, a lot of what the content of that objection is seems to me to be factual in nature. I mean, really, when we go to trial, we're going to be put to the test of how can we say that a particular provision is really safety? Does it have non-safety motivations? These are factual questions, not legal questions. So we would urge the court to treat this as a matter of law. We're way down the road on this program now. The factual situation on the ground is much different than it was when this first came up. So we would ask the court to be mindful of how much it would have to undo to start taking pieces out of it. Okay. Thank you. Thank you. Thank you, Your Honor. Just a few quick points. We've talked about various elements of the plans that had really nothing to do with motor vehicle safety. There are certainly a number of others that are discussed in the briefs, financial oversights requiring to open up your books to the driver, health, placards in the trucks, a number of things. And as this court has said in the Manning case and as the U.S. Supreme Court has said in the railroad transfer case, you can't really untangle the knot of a comprehensive regulatory scheme like this and rewrite the regulation in order to pick out what's preempted and what isn't. We acknowledge that certainly there perhaps are things that are on a standalone basis that may be acceptable, but again, this court nor the district court, I don't believe, would be able to sever those. In terms of all of the other aspects, and I didn't have time to get to the idea of the public interest, but the public interest is served, one, by allowing free competition at the ports. This preemption wasn't put in place just for motor carriers. It was put in place for consumers. These programs will add $1 billion by their own estimate of additional cost on the drage industry each year. So it is in the public interest. All of the other elements we've talked about, the environmental program, that is completely separate and apart. The drage truck registry is separate and apart, the truck retirement. In fact, there's a parallel program by the Air Resources Board that goes into effect next year that has basically the same provisions. It doesn't have a concession plan. The security provisions are all provisions from the federal government. The TWIC provision, the Transportation Worker Identification Card, all of those elements can and are independent of the concession plans. Thank you. Okay. Thank you very much. We appreciate your arguments this morning, and the matter is submitted.
judges: Beezer, Fernandez, Paez